# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Henry W Geter II**
100 Mich. Ave. N.E.   Suite A-11
Washington DC  20017
202/986-2264

      **(Plaintiff)**

    vs.

**Horning Brothers**
1350 Conn. Ave.  N.W. Suite 800
Washington D.C. 20036

**The Cloisters**
100 Mich. Ave. N.E.   Suite A-21
Washington D.C.  20017

**Ms. Veda S. Brinkley**
Assistant Property Manager
Trinity Community LLP
1350 Conn. Ave.  N.W. Suite 800

**Ms. Connie Fletcher**
Manager the Cloisters
100 Mich. Ave. N.E.  Suite A-21

      **(Defendants)**

**Case File No:  07-CV-0757   RBW**


**Filing  Date  June 25th 2007**


*OPPOSITION TO DISMISS*


*DISABILITY DISCRIMINATION FILING*
**FAIR HOUSING VIOLATION**

*(THE CLOISTERS)*

**REASONABLE ACCOMMODATION**
*UNDER THE FAIR HOUSING ACT*

**~ CIVIL RIGHTS ACT of 1968 ~**
**AS AMENDED**


## MEMORANDUM OF LAW AS EVIDENTIARY
## PROFFER THERETO  MOTION TO DISMISS


***PLEADINGS AND MOTION*** ~ ss62:189. Generally   Unless a different time is prescribed by federal statute, a defendant must serve an answer within 20 days after the service of the summons and complaint upon the defendants, except when service of the summons is timely waived on request under FRCP 4(d).

**NOW COMES THE PLAINTIFF**, Henry W. Geter II " *memorandum of the laws*,"[1] fully addressing his rights in opposition to any '**Motion to Dismiss**.' Establishing the fact before this court, that the filed Complaint is held to federal law, and in particularly federal statutes, in violations by the Defendants. As such! any and all elements of a defense against the complaint must be held to those governing cases and annotations ( federal laws) placed before the Courts.

**PURSUANT to the Records of the Court**[2] being fully reviewed upon the arguments and evidences (i.e. Attachments) of the Plaintiff Complaint, by supportive Memorandum's and motion's, as well as, those points of Law held in support of its claims, **NOW COME** this *M*emorandum sufficiently applying the authority of law's, governing the Defendants alleged violations of Title 42 USCA Section 1983.

[*W*]here the complaint alleged violations are in the legal underpinning of substantive rights, the Defendants have the burden to file within the **Records of the Court** evidential proof, demonstrating this via their answer (response) through the existence of genuine facts. The records show that this matter has not been satisfied held to the *procedural rights* due to the administration of the *Federal Rules of Civil Procedure*, given to U S District Courts.

Pg 1

---

[1]. A default judgment is entered when a defendant fails to appear, and relief from judgment is afforded when a defendant's failure to appear is the fault of counsel. West's Ann.Cal.C.C.P s 473 Gotschall v. Daley, 116 Cal.Rptr. 2d 882, 96 Cal. App. 4th 479.

[2]. Included among categories of things of which judicial notice may be taken are facts relating to the records of the court. Md. Rule 5-201 (b). Lerner v. Lerner corp., 750 A.2d 709, 132 Md. App. 32.

**GIVEN IN FACT**, by the **Records of the Court**, that the 'conduct ' portal unto the Plaintiff filing, has its directives minded upon the behavioral ownership of a corporation (its duty of care) imposed [3] by Statute, which is to be administer thereto the public as due care upon its constitutional safeties, as legislated to protect those whom are sighted thereto its intent, the corporation via its management [managers], shall fully allow them held to be protected, to enjoy the freedoms of the enacted rights and the right to pursuit the damages [4] due the violation..

Within this established law of the land, freedom from arbitrary intrusion by others, beyond its administrative authority and conduct, requires that all actions, imposing a non standard of conduct, without reasonable intention, will secure the legal activity of a citizen to ensure and preserve the interest bound to his or her Civil rights. Where a standard of behavior fall below the protections granted by law, and, it is legally seen as imposing an unreasonable risk of harm, and breach of duty, these non-conforming failing's; this departure from expected conduct, shall foster an implied 'negligent' upon them whom were the architects of the circumstances, in removing the securities marshal upon the Statute.

Negligent conduct raised unto the complaint has its pulse upon those Federal Laws in violation by the Defendants ... Title 42 USCA section 1983, Civil Rights Act of 1968, as amended and The Fair Housing Act. The duty invoke thereto each is fully understood by the Plaintiff filing language

Pg 2

---

[3]. Colo. App. 2005 Tortious conduct arises from a breach of a duty imposed by law, not by contract. Adams ex rel. Adams v. city of Westminster, 140 P.3d 8, certiorari denied.

[4]. L.A. 2006 A tortfeasor must compensate a tort victim for all of the damages occasioned by his act. LSA - C.C. art. 2315 - McGee v. A.C. and S. Inc., 933 So.2d 770, 2005 - 1036 (La. 7/10/06).

whereto the Defendants owed a legal duty unto the administration of these laws. While a corporation[5] is a separate entity of its owners, its management are place to a natural person [employee's] whom shall administer its policies and business objectives. As such! the managers[6] as employees bind their employment services to the liability of the corporation.

The *Motion for Final Judgment*, is the 'fatal consequences' of the conduct of the corporation and its managers, set upon the Defendants current legal demeanor given to the lack of argument to response to the complaint file. A violation of a public standard subjective to i.e., malice, reckless conduct, gross negligent, as placed to the absence of legislated standards.

Unto this case Plaintiff pronunciation of Defendant's negligent conduct, being " willful and wanton misconduct " involved an act or omission in reckless disregard of the consequences affecting the life or property of another; held to its failing to conform to an obligation[7] required by standards of conduct, by undertaking an unreasonable response in the performance of a service, and breaching the promises and rights assigned by a Statute and its ' duty of care'.

To summarize the Plaintiff initial filing [complaint], it charges that the conduct and actions and/or

Pg 3

---

[5]. Minn. 2006   A corporation can be held liable for a tort just as a natural person can.  –  Travelers Indem. Co. V. Bloomington Steel & Supply co. 718 N.W.2d 888.

[6]. N.C. App. 2006 A party needs to show only one of the statutory circumstances, i.e., fraud, or malice, or willful or wanton conduct to recover punitive damages from a corporation.  West's N.C.G.S.A. section 1D-15(a). – Scarborough v. Dillard's, Inc., 632 S.E.2d 800

[7]. OKLA. 2006  Punitive damages may be imposed in actions for the breach of obligations not arising out of contract. 23 O.S. 2001, section 9.1 - Lierly v. Tidewater Petroleum Corp., 139 P.3d 897, 2006 OK 47 corrected.

inactions of the Defendants [8] were deliberately carried out without probable cause, through their failure to provide the constitutional affirmation of rights to a U.S. Citizen; acted willfully, and fraudulently in violating the constitutional liberties embodied by due process of the law. That the claims held upon the violation of federal laws [statutes], demonstrate the Defendants galvanized negligent to vacuum pack their actions by its managers application of unreasonable standards of care, administer upon its breached of duty, worn by the specific denial of 'reasonable accommodation' [9] and their conscious indifference upon the Plaintiff disability, and those Federal Rights due. That the Defendants conspired unlawfully among themselves to achieve these illicit objectives, which were promulgated by the non-compliance of proscribe specific conduct; placed therefrom a Statute governing the administrative authority and conduct of corporation and its managers.

Thus! The single voice of the Plaintiff complaint is given to justice of a concerned citizen whom will not turn a blind eye to Housing Providers conduct and activities to trample upon the civil liberties of those whom are Disable, and in a constant struggle for social acceptance, unto them whom are only concern with making an economic profit via the distortion of laws, veil to discrimination.

When they [corporation] are confronted unto their distortion of the Federal laws, they claim that as a corporation they are removed from liability. This understanding has no legal boundary of the

Pg 4

---

[8]. C.A. 2 (N.Y.) 2003  Misconduct of managers within scope of their employment will normally be imputed to corporation. - In re Bennett Funding Group, inc. 336 F.3d 94.

[9]. C.A. 9 (Cal.) 2001   A corporation and its officers may be held liable for compensatory damages for their failure to ensure the corporation's compliance with The Fair Housing Act (FHA), whether or not the officers directed or authorized the particular discriminatory acts that occurred. Civil Rights Act of 1968, ss 801 -812, as amended, 42 U.S.C.A. ss 3601- 3612  – Holley v. Crank, 258 F.3d 1127, Certiorari Granted ~ Meyer v. Holley, 122 S.Ct. 1959, 535 U.S. 1077, 152 L.Ed.2d 1020, Vacated 123 S.Ct. 824, 537 U.S. 280, 154 L.Ed.2d 753, on remand 386 F.3d 1248

laws, and thus has no attachment via a Motion of Dismiss.[10]

This 'veil of discrimination' as mention hereto the above, is not the first time, that the Defendant *Horning Brothers has an immediate history* in the violation rights the root of Federal law. Allow the *Attached Articles* to bring attention to other violations place upon its management aims to " *illegally discriminate against would-be tenants on the basis of how they would pay.* " Further Identifying its as *a Real Estate Management Company*.

**NOW COME THE GOVERNMENT**[11], **U.S. Department of Housing (HUD) and the District of Columbia Office of Human Rights (OHR)** acknowledgment: *Addressing Owner Liability*

In filed a complaint with **HUD**, Case No.: 03-07-0283-8, an official complaint by the plaintiff alleging that an act of discrimination has been committed in violation of the Fair Housing Act of 1988 and the D.C. Human Rights Act of 1977, as amended. Led to an investigated by the District of Columbia Office of Human Rights (**OHR**), Case No. 07-176-H, *per HUD request*.

> **June 18, 2007, ~** *LETTER OF DETERMINATION ... Legal Finding*
> Captioned complaint: **Henry W Geter v. Trinity Community LP, et al**
> **[ Trinity Community LP ... Owner of The CLOISTERS ]**
> Veda Brinkley and Connie Fletcher are employees of Horning Brothers, to which they come under the auspices ... Superior/Vicarious Liability rule.
>
> **Acknowledgment:** see attached Blind Copy    ~ *Probable Cause of Discrimination*
>
> Page 11 of 12... 1st paragraph Notes: ending ~ i.e. Finally, the Respondent refused to grant a reasonable accommodation. Therefore, Complainant establishes a *prima facie* case.
>         4[th] paragraph Notes: starting ~ i.e. Respondent's reasons for denying Complainant's accommodation are weak and *discriminatory*.
>
> Pg 5

---

[10]. E.D. Pa 2001  The corporate entity may not be used to defeat public convenience, justify wrong, protect fraud or defend crime, and the form will be disregarded whenever justice or public policy demand. - Beswick v. city of Philadelphia, 185 F.Supp. 2d 418

[11]. FedCl. 2000 Government officials are presumed to act in good faith. – Northrop Grumman Corp. v. U.S., 46 FedCl. 622

**CAUSE DETERMINATION**

For the foregoing reasons,

Page 12 of 12  paragraph 2)  The **OHR** finds **PROBABLE CAUSE** to believe
that the Respondent One [ *Trinity Community LP (The Cloisters)* ) ] subjected
Complainant [ Henry W. Geter ] to **discrimination on the based on disability**...etc.
...**OHR** will issue a service of charge... to the **District of Columbia Office of the
Attorney General** for *civil enforcement action in a court of competent jurisdiction.*

**HUD** noting upon the Plaintiff that prior to its investigation, Complainant can file suit on his or her

own initiative; too which! if a finding of **PROBABLE CAUSE IS FOUND**, it will lend its

assistance to the Plaintiff actions, and or will file a separate complaint upon its finding, where a

cause of action is place unto a difference action [i.e. *Housing Discrimination*]. Unto this

determination! an action of filing would be placed ONLY upon the Owners of The Cloisters ...

**Trinity Community LP, et al.**   Its filing will not disturb any Federal Complaint seen before the

U.S. District Court.

This *MEMORANDUM* is submitted unto the **Records of the Court**, as a *Testamentary Document*

in evidence, which explicitly states legal instructions[12], they being sufficient by common law

doctrine[13], to examined proper guidelines held upon US District Courts to fully endorse the

Pg 6

---

[12]. C.A. 7 (Ill.) 2004  " Piercing the corporate veil " is not itself an action, but is merely a procedural
means of allowing liability on a substantive claim. - International Financial Services Corp. v. Chromas
Technologics Canada, Inc., 356 F.3d 731.

[13]. Tenn. Ct.App. 2006  A motion to dismiss for failure to state a claim challenges only the legal
sufficiency of the complaint; it does not challenge the strength of the plaintiff's proof. Rules Civ.Proc., Rule
12.02(6)  – Barnes & Robinson Co., Inc. V. OneSouth Facility Services, Inc., 195 S.W. 3d 637.

judicial framework,[14] context to the obligations incurred upon a corporation and its staff, and

the clear wrongdoing set to their hands, when seen to there Jurisdiction.


*TORT LAW*: Imposes liability upon socially undesirable conduct. Since respect for basic
Human Rights is universally required, the " we didn't know " argument is
unavailing to corporations that recklessly disregard those rights.

The tort rule confirms or articulates social ideals and perhaps reinforces them by imposing
liability...*DOBBS, supra note 109, section 16.*



**Respectfully Submitted**

*Henry W. Geter II*
Henry W. Geter II
Plaintiff

Dated: *June 25th*, 2007

100 Mich. Ave. N.E.    Apt. A-11
Washington DC 20017


Attachments (*4*)
*w/ Blind Copy of Letter Determination*



Pg 7



---

[14]. Minn. App. 2006   On a motion to dismiss for failure to state a claim, the allegations contained in the
pleading must be considered as true and viewed in the light most favorable to the pleader. – Larson v. Wasemiller,
718 N.W. 2d 461.



# PHIFER PRESS RELEASE

 

FILE COPY

---

## More Area Landlords Charged with Housing Discrimination while Others Pledge to Stop Discrimination as Part of Critical Settlements

Home

ERC in the News

Media Room

About Us

What We Do

Testimonials

Resources and Links

FAQ

Employment

Contact Us

WASHINGTON, D.C., September 8, 2005—Today, the Equal Rights Center (ERC) and the Washington Lawyers' Committee for Civil Rights & Urban Affairs (WLC) announced the filing of lawsuits against two area landlords, and the favorable settlement of a similar lawsuit and other administrative complaints against landlords charged with denying housing to people using Housing Choice Vouchers.

The combined settlements include one with Sawyer Realty Holdings LLC, among the District's largest apartment management companies, that was filed with the D.C Superior Court earlier today. This agreement resolves a complaint filed in April, and includes numerous commitments from Sawyer that will help ensure that individuals with federal rental assistance in the form of Housing Choice Vouchers (formally known as Section 8 vouchers) are given fair and equal access to Sawyer-managed apartments in the District. As part of the settlement Sawyer will also pay $130,000 to the ERC to continue its ongoing efforts to fight discrimination as well as for attorneys' fees and costs associated with litigating the case.

In the past few months, the ERC has obtained settlements with several other landlords, resulting in comparable commitments to treat individuals with rental vouchers fairly and to not discriminate based on source of income. These settlements, taken together, open more than 500 apartment units in the District of Columbia to persons who use Housing Choice Vouchers to cover a portion of their monthly rent.

"It is just flat out wrong to deny an individual or a family a proper home only because the prospective tenant is assisted by a government voucher to pay the rent," said the ERC Executive Director, Rabbi Bruce E. Kahn. "The settlements we have reached represent significant victories for civil rights compliance and we are pleased to be receiving Sawyer Realty's cooperation in this effort. Too many residents of metropolitan Washington believe that the battle for basic civil rights ended years ago. I want everyone to know that, sadly, the fight is still being fought on many fronts and it is a long way from being over."

Continuing its fight against this type of discrimination, the ERC filed additional lawsuits today in D.C. Superior Court against Horning Brothers and Phifer Realty, Inc., alleging discrimination against prospective tenants who use Housing Choice Vouchers. "Housing Choice Voucher discrimination must end," stated Rabbi Kahn. "The suits announced today represent the Equal Rights Center's ongoing commitment to combating discrimination against Voucher holders."

The new lawsuits, based on evidence uncovered by the ERC, allege that Horning Brothers and Phifer Realty refused to accept Housing Choice Vouchers, in violation of the D.C. Human Rights Act. The ERC alleges that on multiple occasions, landlords and agents stated that the Housing Choice Vouchers would not be accepted, despite the availability of eligible apartment units. In April of this year the ERC also sued area landlords Gelman Management Company and E & G Group, making similar allegations. Those cases are currently pending.

"Low-income families in the D.C. area are facing a housing crisis. It is simply unacceptable for landlords and property managers in this city to refuse to accept families because of their desire to pay a part of their rent using federally funded vouchers. It is illegal to refuse to accept vouchers, or to have quotas limiting the number of Voucher holders. We are pleased that Sawyer has agreed to open its apartment buildings to persons who use Vouchers. We hope these lawsuits and settlements send a clear message to area landlords that stereotypes of low-income

pers_ cannot be used to justify illegal disc___nation," said Isabelle Thabault, of the Washington Lawyers' Committee for Civil Rights & Urban Affairs.

Today's suits against Horning Brothers and Phifer, as well as the earlier actions brought against Gelman Management Corporation, E & G Group and others, are part of a broad effort by the Equal Rights Center to stop discrimination against low-income tenants who use Housing Choice Vouchers. In 2001, in response to complaints that area companies were refusing to rent to persons with Housing Choice Vouchers, the Equal Rights Center initiated an investigation of area apartment owners and management companies, including the companies named in today's lawsuits.

Refusal to accept federal housing subsidies violates the D.C. Human Rights Act, which prohibits discrimination in housing on the basis of source of income. In the District, a party found to have violated the D.C. Human Rights Act may be liable for compensatory and punitive damages, as well as the subject of an injunction. In addition to the District of Columbia, eleven states and numerous local governments, including Montgomery and Howard Counties in Maryland, have enacted local fair housing laws that prohibit discrimination on the basis of source of income.

Originally established in 1983 as the Fair Housing Council of Greater Washington, the Equal Rights Center is a private, not-for-profit, civil rights agency that is now a product of mergers with both the Fair Employment Council in 1999 and the Disability Rights Council of Greater Washington on June 30, 2005. It is dedicated to identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy. To obtain more information about the Equal Rights Center, please go to www.equalrightscenter.org or call the Equal Rights Center at (202) 234-3062.

The Washington Lawyers' Committee for Civil Rights & Urban Affairs was established in 1968 to provide pro bono legal services to address issues of discrimination and entrenched poverty. Since its founding, the Committee has handled more than 5,000 cases on behalf of individuals and advocacy organizations in the areas of equal employment, fair housing, public accommodations, public education, asylum and refugee rights, and disability rights. For more information about the Committee, see www.washlaw.org. The Committee can be reached at (202) 319-1000.

The ERC was represented in the Sawyer litigation by the Washington Lawyers' Committee and Melvin White and William Hagedorn of the law firm of McDermott, Will and Emory, and is represented in the two new lawsuits by the Washington Lawyers' Committee for Civil Rights & Urban Affairs, John P. Relman and Reed Colfax of the law firm of Relman & Associates and Gail L. Westover, Carter L. Williams, and Brendan Wilson of the law firm of Sutherland Asbill & Brennan LLP.

For more information contact:
Bob Bruskin, 202.319.1000 x. 101
Senior Counsel, Washington Lawyers' Committee for Civil Rights & Urban Affairs
Bob_Bruskin@washlaw.org

Rabbi Bruce E. Kahn, 202.234.3062
Executive Director, Equal Rights Center
bkahn@equalrightscenter.org

# THE GEORGE WASHINGTON UNIVERSITY
### WASHINGTON DC

| CONTACTS & DIRECTORY | **SCHOOL OF BUSINESS** |
| --- | --- |

**FILE COPY** 

*ATTACHMENT "B"*

## Horning Brothers

### Accounting Internship

Horning Brothers Corporation, an established <u>real estate management company</u> with nearly 50 years of business in the Washington area, has an exciting opportunity for an intern within our corporate accounting office. We offer a great opportunity for a sharp individual to take on a wide range of accounting responsibilities while working with a great accounting team and learning true real estate accounting.

This part-time internship is located within our corporate office in Dupont Circle and is available immediately. The position could potentially lead into a summer internship or full-time position for the right individual.

Students wishing to be considered for this exciting position should submit their cover letter and resume to Human Resources via email at Resume@HorningBrothers.com or fax to (202) 659-9489.

THE GEORGE WASHINGTON UNIVERSITY
SCHOOL OF
BUSINESS

The GW School of Business ● 2201 G Street, NW ● Duquès Hall Suite 660 ● Washington, D.C. 20052 ● 202-994-6380
©2004 The George Washington University School of Business




**washingtonpost.com**

# Bias Against Vouchers Alleged

Lawsuits Accuse Landlords of Rejecting Would-Be Tenants

By Debbi Wilgoren
Washington Post Staff Writer
Friday, September 9, 2005; B08

**FILE COPY** 



A housing advocacy group yesterday sued two longtime District landlords, saying they have refused to rent apartments to some people who want to use federal vouchers to cover part of the rent.

Horning Brothers and Phifer Realty manage an estimated total of 3,000 rental apartments in the city, mostly in lower- and middle-income neighborhoods. The suits filed in D.C. Superior Court allege that the companies illegally discriminate against would-be tenants on the basis of how they would pay.

The advocacy group filed similar lawsuits in April against several other landlords and property management companies after sending testers to inquire about vacant properties that were advertised in newspapers and other media.

Yesterday, the Washington-based Equal Rights Center announced a settlement with one defendant, including guarantees that vouchers will be accepted at its properties and a pledge to pay $130,000 to the center. The suits are part of an anti-discrimination campaign organized by the center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs.

According to the suits, testers were turned down at Horning and Phifer properties after proffering housing vouchers. Testers went to buildings after hearing from prospective renters that they had been turned away.

The District, Montgomery and Howard counties and 11 states have made it illegal for landlords to discriminate on the basis of how a tenant pays.

"Discrimination remains alive and well here," said Rabbi Bruce E. Kahn, executive director of the Equal Rights Center. "It is just flat-out wrong to deny an individual or family a proper home only because the prospective tenant is assisted by a government voucher to pay the rent."

An official with Phifer denied the allegation yesterday, saying the company has always accepted vouchers and continues to do so. He accused the Equal Rights Center of frivolous litigation.

"This is how this organization creates its own salaries, by suits," Vice President Robert Plante said. "If they want to have a court battle, we're happy to have a court battle with them. We have the respect of our tenants, and we ourselves respect our tenants."

Officials at Horning declined to comment on the lawsuit yesterday. But a report issued in April by the D.C.

Office of Human Rights said the firm stopped accepting vouchers because of long delays in receiving payment.

The Housing Choice Voucher program, formerly known as Section 8, is administered by the D.C. Housing Authority in the city, and officials in the property management industry say the authority is notorious for taking too long to transfer federal funds to landlords. Sean Pharr, a spokesman for the Apartment and Office Building Owner Association, said he has worked with Horning over the years to try to collect money the company is owed.

"We're talking tens of thousands of dollars," Pharr said. "We're talking sustained, concerted efforts on their parts to deal with these shortages."

The District report quoted Horning officials as saying the company was owed $48,000 by the Housing Authority and considered the vouchers a "bad credit risk."

Zachary Smith, a Housing Authority spokesman, said his agency does not believe it owes that much to Horning. He said large landlords such as Horning often have disputes with the authority about rent increases and other financial issues.

The settlement announced yesterday involved Sawyer Realty Holdings, which manages two apartment buildings, one in Petworth and one in Brightwood. The company agreed to post signs at its buildings saying vouchers are welcome and to include that information in its advertisements. It also agreed to train employees on anti-discrimination laws, adjust its minimum-income requirements and provide the Equal Rights Center with data on how many voucher holders it accepts.

Attorneys for the center say voucher discrimination makes it even harder for low-income people to find housing in high-priced Washington. Half of all renters who receive vouchers are unable to find a place in the city to accept them, housing officials say.

© 2005 The Washington Post Company

Ads by Google

Iams Promise
IAMS cares about your pet's health. Receive a $5.00 coupon today!
www.IAMSPromise.com

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
Office of Human Rights

ATTACHMENT "D"



Judiciary Square Office
441 4th Street, NW, Suite 570N
Washington, DC 20001
Phone: (202) 727-4559  Fax: (202) 727-9589

Penn Branch Office
3220 Pennsylvania Avenue, SE, 1st Fl.
Washington, DC 20020
Phone: (202) 727-4559  Fax: (202) 645-6390

**ORIGINAL**

## <u>LETTER OF DETERMINATION</u>

*Via Certified/First Class Mail*

June 18, 2007

Henry W. Geter II
100 Michigan Avenue, # A-11
Washington, DC 20017

**RECEIVED**
DATE: June 22 '07
BY: *Henry W Geter II*

Re:  *<u>Henry Geter v. Trinity Community LP, et al</u>*
     OHR CASE NUMBER:    07-176-H
     HUD CASE NUMBER:   03-07-0283-8

Dear Mr. Geter:

The Office of Human Rights (hereinafter "OHR") has completed its investigation of the above captioned complaint. Henry Geter is referred to as **"COMPLAINANT."** Trinity Community LP is referred to as **"RESPONDENT ONE."** Veda S. Brinkley is referred to as **"RESPONDENT TWO."** Connie Fletcher is referred to as **"RESPONDENT THREE"**. Complainant's charge presented the following issues, which were investigated by the OHR:[1]

## <u>ISSUES PRESENTED</u>

Whether Respondent subjected Complainant to discrimination on the basis of his disability (diabetes, amputated feet) when Respondent delayed or denied granting Complainant's reasonable accommodation request of changing Complainant's rental payment due date to the 15th , rather than the 1st of the month.

## <u>JURISDICTION</u>

The Office of Human Rights ("OHR") has jurisdiction over complaints of discrimination filed within one year of the occurrence of an alleged discriminatory act that took place in the District of Columbia, or within one year of discovering the occurrence of such act. 4 DCMR § 702.1(a). Complainant was a tenant at 100 Michigan Ave., # A-11, Washington, DC 20017, at the time of

---

[1] Veda Brinkley and Connie Fletcher are administratively dismissed as Respondents, as they are employees of Respondent One and come under the auspices of *Respondeat* Superior/Vicarious Liability. Moreover, Respondent One is responsible for the actions of its employees.

*Henry Geter v. Trinity Community LP*
*OHR CASE NUMBER: 07-176-H*
*HUD CASE NUMBER: 03-07-0283-8*
*Page 2 of 12*

the alleged violation. Complainant filed this complaint with the OHR alleging that Respondent discriminated against him as detailed above, in violation of Section 804(f)(3)(B) of Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("FHAA") and in violation of Section 2-1402.21 (d)(3)(B) of the District of Columbia Human Rights Act ("DCHRA"), as amended.

Respondent One is the owner of the multi-family housing unit in the District of Columbia. Respondent Two and Three are employees of the property management company which provides management services for Respondent One. Respondents have sufficient minimal contacts within the District of Columbia, therefore, the OHR has jurisdiction over Respondents.

## FINDINGS OF FACT

The OHR's findings of fact were obtained from the following: (a) Complainants' sworn statement and rebuttal; (b) Respondents' sworn statement; and (c) Respondents' responses to Interrogatories and Requests for Documents and (d) OHR's fact finding conference. Based on its investigation, the OHR makes the following findings of fact:

The Cloisters is a multi-family apartment building with 352 units. Respondent One is the owner of the apartment building. Respondents Two and Three are employees for the management company that operates the facility. The facility is located at 100 Michigan Ave., Washington, DC 20017.

Complainant filed a complaint with the U.S. Department of Housing and Urban Development on March 15, 2007 alleging he was discriminated against by the Respondent based on disability (diabetes and amputated feet) when Respondent failed to grant Complainant's reasonable accommodation and allow him to pay his rent on the 15th, rather than the first of every month.

The OHR record contains Complainant's Notice of Award for his disability from the Social Security Administration effective May 30, 2003. The award denotes Complainant's payment will be issued on or about the second Wednesday of each month.

Complainant's monthly rental payment is $1418.00. Complainant received three (3) delinquent rental notices for the month of March 2007: March 6, 2007 for a balance due of $1,433.00; March 11, 2007 for $1448.00; and March 16, 2007 for $1,468.00. Complainant was charged three (3) late fees during March 2007. Complainant submitted a rental payment to the Cloisters Apartment in the amount of $1,510.00 on March 23, 2007. Complainant consistently paid his rent between the 16th and 18th of every month.

The OHR record contains a Notice to Cure Violation of Tenancy or Vacate issued to Complainant by Respondent One's property management company on February 16, 2007. The notice states:

> *"By Continually and habitually paying your rent late. According to your lease, the rent is due and payable on or before the first day of the rental period without notice or demand for the same."*

*Henry Geter v. Trinity Community LP*
*OHR CASE NUMBER: 07-176-H*
*HUD CASE NUMBER: 03-07-0283-8*
*Page 3 of 12*

The DCHRA and FHAA provide that it is unlawful for any person to refuse to make a reasonable accommodation in the rules, policies, practices, or services, when such accommodation may be necessary to afford such person equal opportunity to use and enjoy a dwelling unit including public use and common areas.

## Complainant's Allegations

Complainant alleges that he is disabled within the meaning of the FHA and the DCHRA. Complainant contends that he has diabetes, and mobility issues, specifically that his feet were amputated. Complainant alleges he was unable to work, and began receiving disability payments from Social Security. Complainant states he receives his disability payments once a month on the second Wednesday of the month. Complainant alleges that on or about October 20, 2003, he provided written medical documentation including a letter to Respondent's property management employee requesting a reasonable accommodation adjusting the due date of his rent based on when he receives his disability check so that he would not have to pay late charges every month.

Complainant asserts Respondents never provided Complainant with his reasonable accommodation request. Instead, Complainant states he continued to pay his rent late as he incurred a late fee every month. Complainant alleges there were no problems between he and Respondents until about November 2006 when he went to the rental office to pay his rent. Complainant claims Respondent's Accounting Clerk suggested to Complainant that he consider signing his Social Security check over to Respondents. Complainant states he refused to sign over the check to Respondents.

Complainant alleges that on or about February 17, 2007 he received a Notice to Cure from the Respondent One's Assistant Property Manager, advising him that Respondents would no longer accept late rent payments from Complainant.

Complainant alleges that on or about February 22, 2007 he sent a second request for a reasonable accommodation to Respondent's property manager mirroring the request made in 2003. Complainant asserts Respondents have not answered his latest request.

Complainant believes that Respondents are treating him differently with respect to terms and conditions or services and facilities based on his disability. Complainant believes that Respondents are forcing him out of his unit because of his disability. Complainant believes that Respondents failed to reasonably accommodate him by permitting him to pay his rent in the middle of the month without penalty.

## Complainant's Documents

Complainant submitted a faxed reasonable accommodation request dated February 22, 2007 addressed to Respondent Ones' property manager.

The confirmation form indicates the telephone number where the fax was sent is (202) 986-1215. The OHR investigation confirms this is the correct fax number for Respondent's property management office.

## Respondent's Defenses

Respondents maintains they have never received Complainant's reasonable accommodation request, and have no obligation to accommodate Complainant's reasonable accommodation request, because the request would change their policies, and the accommodation is not related to his disability.

Respondents state that Complainant is afforded the same opportunity to pay the rent as everyone else, and given the same amount of grace days to pay his rent on time without incurring late charges. Respondents maintain that rent payments are a contractual matter, and are unrelated to Complainant's disability.

Respondents note that when Complainant moved in during March 2003, he received a one-month concession on his rent, something which was given to all tenants at this time. Respondents declare that because of this one month rent-free concession given to Complainant, Complaint should actually be two (2) weeks early on his rent, not two weeks late.

Respondents also provided a list of seven (7) different residents whom they have granted reasonable accommodations for in the past year. These accommodations ranged from handicapped parking signs, to removing carpet and widening doorways, to unit transfers for residents.

## Complainant's Rebuttal to Respondent's Defenses

Complainant notes that he faxed the request to Respondent on February 24, 2007, and submitted the fax, and the transmission verification report which indicated the fax was successfully transmitted.

Complainant notes that reasonable accommodation requests are normally specifically asking to change a standard policy or rule because of a disability, so it is a violation not to grant a reasonable accommodation request because Respondent's standard policies would be changed. Complainant also notes that he did not become disabled until nine (9) months after he moved into Respondent's building, and thus he had no foreknowledge during which he could have applied the one month's free rent which was offered to all of the tenants upon move-in.

Finally, Complainant states that there have been other cases in which a landlord's refusal to extend payment dates for disabled residents have resulted in liability for the landlord.

## Respondent's Policies

The OHR investigation revealed that Respondent has a standard lease, signed by Complainant in February 2003, which states that the rent is due on the first of the month, with a grace period

until the fifth (5th) of the month.

## OHR Interviews

Respondent Two was asked if she had received the fax requesting a reasonable accommodation from Complainant. Respondent Two denied ever receiving the fax, or any of her employees ever receiving a fax requesting an accommodation from Complainant. Respondent Two was asked if she had received a fax, would she have granted Complainant's request. Respondent Two indicated that even if they had received the request, the accommodation still would not have been granted, because Respondent did not feel it was related to Complainant's disability, and that she then would have to grant other residents request to do the same thing as Complainant.

## STANDARD OF REVIEW

In order for a Complainant to prevail in this forum, the OHR must find that the OHR's record contains credible, probative, and substantial evidence from which a reasonable person could conclude that the *prima facie* elements of discriminatory behavior are present, and that a legitimate, nondiscriminatory explanation for the behavior either does not exist or is pretext for unlawful discrimination. 4 DCMR § 715.1; 4 DCMR § 499.1.

## LEGAL ANALYSIS

Under the Fair Housing Act, as amended (FHAA), it is unlawful for a housing provider to refuse to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling including the public use and common areas. 42 USC § 3604(f)(3)(B).

Discrimination may be proven either by direct evidence of discrimination, evidenced by the actions or words of the Respondent, or indirectly, following a burden-shifting analysis. The burden-shifting procedure initially established in *McDonnell Douglas Corp. v. Green* with respect to employment discrimination is applied to housing discrimination cases under the DCHRA and FHAA, as amended. *See, e.g., Neithamer v. Brenneman Property Services, Inc.*, 81 F. Supp. 2d 1, 3 (D.D.C. 1999); *Miller v. Poretsky*, et al., 595. F.2d 780, 791-792 (D.C. Cir. 1978) (concurring opinion); *United Mine Workers of Am. Int'l Union v. Moore*, 717 A.2d 332, 338 (D.C. 1998); *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986); *Hall v. Lowder Realty Co.*, 160 F.Supp.2d 1299, 1313-14 (M.D. Ala. 2001).

A plaintiff may prove discrimination under the FHAA by showing: (1) discriminatory effect, "disparate impact," (2) intentional discrimination, "disparate treatment," or (3) failure to provide reasonable accommodation. *T.K. v. Landmark West,* 802 A.2d 609, (N.J. 2001). Under the DCHRA, the same three-part test applicable to Title VII cases applies. *Atlantic Richfield Co. v. District of Columbia Comm'n on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986). The initial burden is on the Complainant to prove his *prima facie* case of discrimination. *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 361 (D.C. 1993*); see Texas Department of Community Affairs*

*v. Burdine*, 450 U.S. 248 (1981). If the Complainant satisfies his burden, he raises a rebuttable presumption that the Respondent's conduct is unlawful discrimination. *Arthur Young*, 631 A.2d at 361. After this rebuttable presumption is raised, the Respondent must then articulate "some legitimate, nondiscriminatory reason for the employment action." *Atlantic Richfield*, 515 A.2d at 1099 (citing *Burdine*, 450 U.S. at 254). The Respondent can "satisfy its burden by producing admissible evidence from which the trier of fact [can] rationally conclude that its action [was not] motivated by discriminatory animus." *Atlantic Richfield*, 515 A.2d at 1099-1100. The Respondent need not persuade the "[trier of fact] that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254.

If the Respondent articulates a legitimate, nondiscriminatory reason for its action, "the burden shifts back to the Complainant to prove…that the Respondent's stated justification for its action 'was not its true reason but was in fact merely a pretext' to disguise discriminatory practice." *Arthur Young*, 631 A.2d at 361 (citation omitted). "This burden merges with the ultimate burden of persuasion on the question of intentional discrimination." *Atlantic Richfield*, 515 A.2d at 1100. "[A]lthough the *McDonnell Douglas* presumption shifts the burden of production to the defendant, 'the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993)(quoting *Burdine*, 450 U.S. at 253).

Thus, once the Respondent satisfies its burden of producing a nondiscriminatory reason for its action, the Complainant must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center*, 509 U.S. at 515 (emphasis in original). It is not enough for the Complainant simply to show that the Respondent's proffered reason for its action was pre-textual, although that will "often considerably assist him in doing so." *St. Mary's Honor Center*, 509 U.S. at 517; *see also Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000). The Complainant must also prove "that the Respondent has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514. While pretext in the proffered reason for the action may, "in appropriate circumstances" justify an "inference" of discrimination, *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), a Plaintiff is never relieved of the burden of proving "that the Respondent has unlawfully discriminated." *St. Mary's Honor Center*, 509 U.S. at 514. In fact, judgment as a matter of law would be appropriate for the Respondent (i) "…if the record conclusively revealed some other, nondiscriminatory reason for the Respondent's decision…," or (ii) the plaintiff's factual challenge to the Respondent's articulated reasons was "weak" and there was "abundant and uncontroverted" independent evidence that no discrimination had occurred. *Reeves* at 148.

## FAILURE TO ACCOMMODATE A DISABILITY UNDER THE FHAA AND THE DCHRA

To establish a reasonable accommodation defense under the Fair Housing Act, the tenant must demonstrate that (1) she suffered from a "handicap" (or "disability"), (2) the landlord knew or should have known of the disability, (3) an accommodation of the disability may be necessary to afford the tenant an equal opportunity to use and enjoy her apartment, (4) the tenant requested a reasonable accommodation, and (5) the landlord refused to grant a reasonable accommodation. *See ;United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir.

1997); *Prindable v. Association of Apt. Owners of 2987 Kalakaua*, 304 F. Supp. 2d 1245, 1254 (D. Haw. 2003); *Adam v. Linn-Benton Hous. Auth.*, 147 F. Supp. 2d 1044, 1047 (D. Or. 2001); *Means v. City of Dayton*, 111 F. Supp. 2d 969, 977 (S.D. Ohio 2000); *In re Kenna Homes Coop. Corp.*, 210 W. Va. 380, 557 S.E.2d 787, 794 (W.Va. 2001).

The federal Fair Housing Act does not require that a dwelling be made available to an individual whose tenancy would constitute a direct threat to the health or safety of other individuals or whose tenancy would result in substantial physical damage to the property of others. 42 USC §§ 3604 (f)(9) (2001); DC Code §§ 2-1402.21 (2001) The Act's administrators, as well as the courts, have also ruled that an accommodation will not be reasonable, and thus will not be required, if it would impose an undue financial and administrative burden on the landlord or would fundamentally alter the nature of the landlord's operation. Joint Statement of the Department of Housing and Urban Development and the Department of Justice, Reasonable Accommodations under the Fair Housing Act (May 17, 2004).

Under the federal Fair Housing Act, unlawful discrimination occurs whenever a dwelling is denied to a renter because of that renter's disability. *Radecki v Joura*, 114 F3d 115 (8th Cir 1997). Under federal case law interpreting that provision, a discriminatory denial can occur at any time during the entire period before a tenant is "actually evicted;" actionable discrimination is not limited to the shorter cure period specified in a notice to cure or quit, or to any other period short of the eviction order itself. As a general rule, therefore, a "reasonable accommodation" defense is available at any time before a judgment of possession has been entered, if the other requirements of the defense are met.

Under the federal Fair Housing Act, a landlord is only obligated to provide a reasonable accommodation to a tenant if a request for the accommodation has been made. Joint Statement 11. A tenant who requests a reasonable accommodation, moreover, should make clear to the landlord that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. *Id.* And she should explain what type of accommodation she is requesting. On the other hand, the Fair Housing Act does not require that a request be made in a particular manner.

Under the Act, a tenant's failure to make clear in her initial request what type of accommodation he or she is requesting is not fatal. According to applicable case law, including an administrative adjudication by the Department of Housing and Urban Development itself, once the tenant requests a "reasonable accommodation" (or, without using those exact words, requests an accommodation for a disability), the landlord is obliged under the Act to respond promptly. (See, Joint Statement, "landlord has an obligation to provide prompt responses to reasonable accommodation requests.") If the request is not sufficiently detailed to reveal the nature of that request, the Act - as properly interpreted - requires the landlord to "open a dialogue" with the tenant, eliciting more information as needed, to determine what specifics the tenant has in mind and whether such accommodation would, in fact, be reasonable under the circumstances. Any delay from the landlord's failure to respond promptly to the tenant's request may become the landlord's responsibility.

Until a landlord makes a good faith, reasonable effort for an accommodation, upon request, after learning of a tenant's mental impairment, the landlord's continued pursuit of a pending action for possession is a discriminatory act under the federal Fair Housing Act.

## THE INTERACTIVE PROCESS

Although neither statutory language in the Fair Housing Act nor its implementing regulations expressly require an "interactive process" for resolving requests for reasonable accommodations, several courts have indicated that the Act's statutory scheme inherently imposes such a requirement. *Jankowski v Lee and Associates, v Cisneros*, 91 F3d 891, 895 (7th Cir 1996) (if landlord is "skeptical of" tenant's alleged disability or landlord's ability to provide accommodation, "it is incumbent upon [] landlord to request documentation or open a dialogue"); *Jacobs v Concord Vill. Condo. X Assn*, 2004 US Dist LEXIS 4876, AT *5 (D. FL Feb 17, 2004); *Armant v Chat-Ro Co*, LLC, No 00-1402, 2000 US Dist LEXIS 11386, at *6 (ED La Aug 1, 2000); (quoting *Jankowski Lee & Assocs.* and further holding that once apprised of possible disability, landlord has duty to inquire or investigate further);*Auburn Wood I Homeowners Assn. v Fair Employment & Housing Comm.* (2004) 121 Cal. App. 4th 1578, 1598 [18 Cal Rptr 3d 669, 683] (quoting *Jankowski Lee & Assocs.* and further holding that obligation to "open a dialogue" with party requesting reasonable accommodation is part of interactive process in which each party seeks and shares information);*Cornell v Taylor LLP v Moore*, 200 Minn. App LEXIS 1317, at *11 (Min App Div Dec. 22, 2000)(quoting *Jankowski Lee & Assocs.*); *Cobble Hill Apts. Co*, 1999 Mass. App. Div. at 169 (the fact that tenant's reasonable accommodation request is neither specific nor suitable "does not relieve landlord from making one, particularly when tenant is handicapped by mental disability"). Compare *Andover Housing Authority v Shkolnik*, 443 Mass. 300, 820 NE 2d 815 (Mass. 2005) (housing authority did not violate "reasonable accommodation" requirement when evicting excessively noisy tenant, because housing authority had "made every effort to engage in an interactive process for ascertaining and accommodating [tenant's] condition" while tenants "impeded the authority's efforts to engage in a full interactive dialogue" by denying "that there was an ongoing and excessive noise problem"). *See generally* Jennifer L. Dolak

The U.S. Department of Housing and Urban Development has also taken this position. *See HUD v. Jankowski Lee & Assocs.*, HUDALJ 05-93-0517-1 (June 30, 1995) (once informed of the possibility that a tenant may need an accommodation, a landlord has the responsibility to explore that need and suggest accommodations). The HUD-DOJ Joint Statement explicitly calls for an "interactive process" in which the landlord and tenant "discuss the [tenant's] disability-related need for the requested accommodation and possible alternative accommodations," in the hope of negotiating "an effective accommodation for the [tenant] that does not pose an undue financial and administrative burden for the [landlord]." Joint Statement 7; *see id.* 9. Finally, when courts apply the reasonable accommodation provision of the Fair Housing Act, it is their established practice to rely on the Americans with Disabilities Act (ADA),42 USC §§ 12101, 12102, and the Rehabilitation Act (RA), 29 USC § 794, both of which mandate an interactive process through which employers and employees explore what accommodations are reasonable. *See* 29 C.F.R. § 1630.2 (o)(3) (1995); 29 C.F.R. pt. 1630 Appendix (1996); 29 USC § 794 (d); *Giebeler*, 343 F3d at 1156-57 (stating that court ordinarily applies RA case law in applying reasonable accommodation provisions of Fair Housing Act and also generally applies RA and ADA case

law "interchangeably"); *Good Shepherd Manor Foundation, Inc. v City of Momence*, 323 F3d 557, 561 (7th Cir 2003) (holding that Fair Housing Act requirements for showing failure to reasonably accommodate are same as those under ADA); *Shapiro*, 51 F3d at 335 ("reasonable accommodation" was intended to draw on case law under RA); *Erdman v City of Fort Atkinson*, 84 F3d 960, 962 (7th Cir. 1996) ("reasonable accommodation" requirement of Fair Housing Act is most often interpreted by analogy to same phrase in RA). The case law that the landlord relies on is factually distinguishable. *See, Lapid-Laurel v Zoning Board of Adjustment*, 284 F3d 442, 455 (3rd Cir. 2002) (holding that Fair Housing Act imposes no duty on local land use authorities to engage in informal interactive process with applicants for variance because those authorities "already face detailed state and municipal requirements mandating formal procedures, which, at least in some cases, prohibit them from engaging in informal, off-the-record negotiations"); *Groner*, 250 F3d at 1047 (holding that landlord violated no duty to engage in dialogue with social worker when landlord had already been in close contact with social worker for months). The Joint Statement 11 states that "An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation."

In a discrimination claim under the federal Fair Housing Act, when a tenant proposes a coherent, ostensible feasible accommodation responsive to her disability, the burden shifts to the landlord to ask for whatever additional details it considers necessary to evaluate that proposal. A landlord's obligation to elicit additional information about a basically understandable accommodation is no different from its obligation to fill out the details about a tenant's announced illness or elicit her reasons why a requested accommodation will alleviate her disability.

## DISABILITY

Under the DCHRA, a Plaintiff can establish that he has a disability if: (1) the Plaintiff has a physical impairment that "substantially limits" one or more of the Plaintiff's "major life activities;" (2) there exists a record of a physical or mental impairment whereby the Plaintiff has been classified (or misclassified) as having an impairment that "substantially limits" one or more of his "major life activities;"[2] or (3) the Plaintiff has a physical or mental impairment that the Defendant erroneously believes substantially affects one or more of the Plaintiff's "major life activities." *See,* 42 U.S.C. § 12102(2); *Liff v. Secretary of Transportation*, 1994 U.S. Dist. LEXIS 20970. The Plaintiff may establish that he suffered from a disability by sufficiently proving any one of the foregoing three elements. *Grant v. May*, 786 A.2d 580, 583 (D.C. 2001); *Cook v. RhodeIsland*, 10 F.3d 17, 22-23 (1st Cir. 1993); *Chandler v. City of Dallas*, 2 F.3d 1385, 1392 (5th Cir. 1993). However, Plaintiffs attempting to establish a qualified disability are held to a "demanding standard" in recognition that the ADA was intended to protect only those persons with impairments that preclude the performance of activities that are of central importance to daily life. *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, 197.

---

[2] The Respondent must be aware of this history.

*Henry Geter v. Trinity Community LP*
*OHR CASE NUMBER: 07-176-H*
*HUD CASE NUMBER: 03-07-0283-8*
*Page 10 of 12*

A disability is defined as a "physical or mental impairment that substantially limits one or more of the major life activities of an individual having a record of such an impairment or being regarded as having such an impairment." D.C. Official Code § 2-1401-02(5A).[3] A physical impairment is "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." *Toyota*, 534 U.S. at 195-96. The ADA regulations define mental impairment as "any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(i). The term "impairment" does not include "transitory illnesses which have no permanent effect on the person's health." *Stevens v. Stubbs*, 576 F. Supp. 1409 (D. Ga. 1983). Instead, a disability must be a serious injury or impairment of more than a temporary nature. *Providence Journal Co. v. Mason*, 116 R.I. 614, 359 A.2d. 682 (1976); *Lyons v. Heritage House Restaurants, Inc.*, 432 N.E.2d 270 (Ill. 1982).

A physical or mental impairment "substantially limits" when it considerably limits or limits "major life activities" to a large degree. *Toyota*, 534 U.S. at 196-97. "Major life activities" are those activities that are of central importance to daily life. *Id.* This jurisdiction has defined "major life activities" as functions the average person in the general population can perform with little or no difficulty, including, but not limited to, walking, seeing, hearing, breathing, standing, sitting and working. *Croley v. Republican Nat'l Comm.*, 759 A.2d 682 (D.C. 2000). *Cf. Toyota, supra,* 534 U.S. at 200 ("because of the conceptual difficulties inherent in the argument that working is a major life activity, [the Supreme Court has] been hesitant to hold [that working is a major life activity]"). To make the *prima facie* showing, the employee must present evidence as to the nature and severity of her impairment, its duration or expected duration and the permanent or long-term impact. *Toyota*, 534 U.S. at 198.

In cases where a Complainant alleges that he/she was denied a reasonable accommodation, the Complainant must demonstrate that he/she requested an accommodation, *Evans v. Davis Memorial Goodwill Industries*, 133 F. Supp. 2d 24, 27-28, *aff'd* 2001 U.S. App. LEXIS 28415, described the accommodation sought, *Flemmings* at 861; *Heasley* at 165, and that the Respondent denied the request. *Evans* at 27-28.

### *Complainant demonstrates that Respondent refused to make a reasonable accommodation for his disability.*

Complainant alleges that Respondent failed to accommodate his disability when Respondent denied or delayed granting Complainant's reasonable accommodation request of allowing him to change the due date on his rent from the first of the month to the 15th.

Complainant establishes a *prima facie* case for discrimination on the basis of his disability. Complainant establishes the first element by virtue of his membership in a protected class under the DCHRA and ADA (disability). Based on information in the OHR record, Complainant has a

---

[3] This definition is substantially similar to the ADA's definition of disability: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Henry Geter v. Trinity Community LP*
*OHR CASE NUMBER: 07-176-H*
*HUD CASE NUMBER: 03-07-0283-8*
*Page 11 of 12*

physical impairment because he has demonstrated that he has a "physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine. Complainant has an endocrine/metabolic disorder (diabetes) and it resulted in an anatomical loss, amputation. Complainant has also demonstrated that his physical impairment substantially limits one or more of his major life activities. Complainant cannot ambulate, therefore, his mobility and his ability to work is substantially limited. Furthermore, there exists a record of a physical or mental impairment whereby the Complainant has been classified as having an impairment that "substantially limits" one or more of his "major life activities.[4] Complainant also meets the second element. The landlord knew or should have known of the disability. In addition, this accommodation of the disability may be necessary to afford the tenant an equal opportunity to use and enjoy her apartment. Complainant demonstrated that he requested a reasonable accommodation; he asked that the date for rent be changed to the 15th of the month. Finally, the Respondent refused to grant a reasonable accommodation. Therefore, Complainant establishes a *prima facie* case.

Respondent does not establish that granting the reasonable accommodation would be an undue burden. Respondents maintains they have never received Complainant's reasonable accommodation request, and have no obligation to accommodate Complainant's reasonable accommodation request, because the request would change their policies, and the accommodation is not related to his disability.

Respondent states that Complainant is afforded the same opportunity to pay the rent as everyone else, and given the same amount of grace days to pay his rent on time without incurring late charges. Respondents maintain that rent payments are a contractual matter, and are unrelated to Complainant's disability. Finally, Respondents note that when Complainant moved in during March 2003, he received a one-month concession on his rent, something which was given to all tenants at this time. Respondents declare that because of this one month rent-free concession given to Complainant, Complaint should actually be two (2) weeks early on his rent, not two weeks late.

Respondent's reasons for denying Complainant's accommodation are weak and discriminatory. To begin, under the DCHRA and the ADA, Respondent has an absolute obligation to accommodate Complainant's disability[5] or at the very least engage in the interactive process, even if it means changing its policies and practices. This is the basis for requesting an accommodation. Second, Respondent contends that the accommodation has nothing to do with Complainant's disability. Complainant has demonstrated he has a disability; and he receives his disability checks on the second Wednesday of the month. Therefore, he is asking for this accommodation because he receives the checks **for his disability** and inability to work after the first of every month. (*emphasis added*) Respondent's reasoning is unconvincing; and it is almost incredible that it gives this explanation for its denial or that it denied this nominal request.

---

[4] The Respondent must be aware of this history.

[5] Unless proving an undue burden.

## CAUSE DETERMINATION

For the foregoing reasons,

1) **RESPONDENTS TWO (Veronica Brinkley)** and **RESPONDENT THREE (Connie Fletcher)** are **ADMINISTRATIVELY DISMISSED** as **RESPONDENT ONE** is the proper party in this dispute.

2) The OHR finds **PROBABLE CAUSE** to believe that Respondents One subjected Complainant to discrimination on the based on disability (diabetes and amputated limbs) when Respondent denied or delayed in granting Complainant's request of allowing him to change the due date of his rent from the first to the 15th of the month.

Respondents are requested to notify the OHR within ten (10) days after receipt of this letter of Determination as to whether they are prepared to pursue conciliation of this matter. If Respondents do not respond or do not respond in the affirmative, the OHR will issue a service of charge notifying the Complainants that they can elect to have this case processed for public hearing before the District of Columbia Commission on Human Rights or referred to the District of Columbia Office of the Attorney General for civil enforcement action in a court of competent jurisdiction.

*IT IS SO ORDERED.*

Sincerely,

Gustavo F. Velasquez
Director

cc:    Phillip L. Felts, Esq.
       Schuman & Felts, CHTD
       4804 Moorland Lane
       Bethesda, MD 20814